**BROIDY v. STATE MUT. LIFE ASSUR. CO. OF WORCESTER et al.**

Civ. A. No. 10406.

United States District Court
E. D. New York.

June 27, 1950.

See also 10 F.R.D. 195.

Warner & Birdsall, New York City (Arthur G. Warner and James E. Birdsall, New York City, of counsel), for plaintiff.

448

Cravath, Swaine & Moore, New York City (George Stephen Leonard and Maurice Rosenberg, New York City, of counsel), for defendant State Mutual Life Assurance Company of Worcester, Mass.

Thomas F. Dougherty, New York City, for defendant First Federal Savings and Loan Association of Hempstead.

BYERS, District Judge.

The plaintiff seeks judgment against the defendant Insurance Company, reforming a Certificate of Life Insurance issued by it under its Group Life Creditors Policy No. GC-203 entered into with the defendant First Federal Savings and Loan Association of Hempstead, to be referred to as Federal.

The provision of the said Certificate sought to be reformed by its exclusion thereof, is as follows:

"Aviation Limitation

"Notwithstanding anything in the Policy to the contrary, the insurance under the Policy shall not cover death of the Debtor sustained while in or on any vehicle or mechanical device for aerial navigation, or in falling therefrom or therewith or while operating or handling any such vehicle or device, except that payment will be made for death resulting from any of the hazards of aviation while the Debtor is riding as a fare-paying passenger in a licensed passenger aircraft operated by a licensed pilot for an incorporated passenger carrier over a regular passenger route between definitely established airports and the Company shall be liable only for the return of the amount of premiums paid under the Policy for the insurance with respect to the Debtor whose death is not covered in accordance with the terms of this paragraph."

The foregoing is printed in the same sized type as other provisions, but is on the reverse side. The front, however, contains the following: "The provisions printed on the reverse side of this Certificate are hereby incorporated and made a part of this Certificate. This Certificate is not a part of and does not alter, modify, or constitute any of the provisions of said Policy or as

it may be subsequently amended, altered or cancelled."

The purpose of the Certificate was to insure payment up to the sum of $10,000.00 of a mortgage executed by the plaintiff and her deceased husband, Vinton E. Broidy, in the sum of $11,400.00, which with its accompanying bond was executed, acknowledged and delivered by the mortgagors when title to the premises involved was closed on March 15, 1948, in the office of the mortgagee.

At the closing, the mortgagors and their attorney, Mr. Nathaniel Taylor, were present, and the vendors, Mills by name, and their attorney, Mr. Lockwood, also, and the real estate broker, Mr. McDermott, and a Mr. Naumer who suggested the procurement by the debtor of the insurance Certificate involved in this litigation. It is material to the present issue to ascertain what was said in connection with the application for insurance; and to decide the legal effect to be given to any representations which the plaintiff says were made by the witness Naumer in that connection, if the evidence is in her favor on that issue.

Something should be said concerning the Policy and the purpose of the insurance, since this is not the ordinary case of an insured, or someone claiming under him, making an assertion that a life insurance Policy was not issued in accordance with an agreement reached between the Insurance Company and its Policy holder.

Here what is called a blanket policy of insurance, was issued by the defendant State Mutual Life Assurance Company to Federal, which is called the Creditor, on June 6, 1947, for the period of one year, by which the Company agreed to pay Federal "immediately upon receipt of due proof of the death of any insured debtor, the amount for which the debtor is insured, to be applied by the Creditor (Federal) to the discharge of the indebtedness. Payment by the Company to the Creditor shall completely discharge the Company's liability to the extent of such payment. * * * If, on any date, the number of new debtors becoming insured hereunder in the preceding twelve months shall be less than one hundred, the Company, on the next renew-

al date, may decline to insure new debtors becoming indebted to the Creditor after such renewal date, provided that the Company shall give the Creditor at least thirty-one (31) days written notice that new debtors are not to be insured hereunder."

Next is set forth a table of Premium from ages 21 to 70, inclusive, on each $1,000 of insurance, together with a provision for their calculation, based upon the number of thousands of dollars of insurance involved; and to the effect that Premiums are payable by the Creditor monthly in advance at the Home Office of the Company.

An eligible debtor is described as one who becomes indebted to the Creditor, provided he meets the following conditions:

(a) Not more than 240 equal monthly installments are required to pay his indebtedness.

(b) He is the principal wage earner, if the indebtedness is evidenced by an instrument executed by two or more persons.

There are clauses touching the establishment of eligibility, which involve approval by the Home Office of the Company, and the $10,000.00 limit of the amount of insurance.

The General Provisions include the issuance of an individual Certificate showing the insurance protection to which the debtor is entitled, and termination of the insurance when indebtedness is discharged, or assumed by someone else, and other matters not presently pertinent.

The Policy may not be modified except by endorsement or amendment signed by the Creditor and by an officer of the Company. In this connection the provision is: "No agent can make, alter, or discharge this contract or extend the time for the payment of the premium or premiums."

Then occur provisions touching incontestability, suicide, and the aviation limitation above quoted; also participation in divisible surplus.

This Master Policy was in the possession and custody of Federal at the time of the closing of title, but it was not produced for the inspection of Broidy, and Naumer, who solicited the insurance Certificate, says that he made an unsuccesful effort to examine the Policy in connection with matters appearing below.

The Master Policy was solicited by the insurance brokers, Craig & Herren, of Hempstead, where the Federal does business; that firm was a duly authorized agent of the Equitable Life Assurance Society, and in addition had been authorized by the State Mutual likewise to solicit this and other forms of life insurance; this Mr. Naumer was also a licensed Equitable agent, who had offices with Craig & Herren, and at their suggestion he established desk room or other temporary quarters in the office of Federal, to assist in instructing an employee of the latter concerning the procurement from Federal debtors of participation in this Group Insurance Plan; he received no compensation for that activity, either from Craig & Herren, Federal, or the State Mutual Company.

However, Craig & Herren did receive one-third of a $3.00 fee received by Federal for each such approved application written at its office.

It was obviously to the interest of Federal to induce its debtors to take this form of insurance, for the sake of the additional security thereby acquired, which explains the presence and activity of Naumer. At some time during the closing he appeared and suggested to Colonel Broidy that the latter apply for the insurance, and the subject was discussed back and forth between him and his wife, on the one side, and Naumer, on the other. This was in the presence of Taylor, who was preoccupied in computing the closing figures, but upon being appealed to by the Broidy's for his advice, he participated in the conversation. Since the vendors and their attorney and the broker were not called as witnesses, it is assumed that they did not hear or participate in these matters.

The testimony of Mrs. Broidy and Taylor is clearly to the effect that Naumer assured both Colonel Broidy and Taylor that the Group Insurance participation would cover Colonel Broidy, even in the event that his death should occur while he was flying in the course of his service in the United States Army. He was wearing his

450

uniform and was known to be a commissioned officer in the Air Service.

Naumer testified to the contrary, and this is the only substantial conflict of fact in this litigation.

The result of the disputed conversation was that Colonel Broidy signed an application on the form provided by the Insurance Company which is entitled "Request For Insurance Coverage Under Group Creditors Insurance Policy Issued by State Mutual Life Assurance Company * * * To First Federal Savings & Loan Assoc. of Hempstead (Creditor)".

This form is dated March 15, 1948, and gives the name of the debtor, his residence, place of birth, and other personal information, and as the name and address of employer, "U.S. Air Force, Mitchell Field", and as his occupation, "Lieut. Colonel"; the date of birth, the loan in respect of which the application is made, and that the applicant is the principal wage earner who is the obligor. That he is in sound health; has never been declined or rated for insurance, and has never claimed disability benefits; his height and weight, and other data reflecting his physical condition, and that he has not been treated by a physician or in a hospital, and has had no illness or diseases.

Immediately over the signature is a statement that the above matters have been correctly stated, and that "the insurance requested shall be effective from the date the loan becomes effective provided the Insurance Company shall be satisfied that I was insurable for such insurance and shall have approved this request at its Home Office, otherwise such insurance shall become effective as of the date of such approval".

A suicide clause within two years, and a waiver of the confidential character of medical disclosures on the part of his physician are also part of this paragraph.

Why the Aviation Limitation should not have been referred to in the same way that the suicide clause was in that application has not been the subject of explanation. Had that precaution been taken, this controversy would have been avoided.

The Certificate, although dated March 15, 1948, was not received by Colonel or Mrs. Broidy until May 7, 1948, when it came by mail, together with a passbook for entering payments of premiums to Federal.

Such payments were so made and entered, the first being dated May 10, 1948; thereafter payments at 4 weeks' intervals followed until the month of August, 1948, in the sum of $4.70 each.

On August 21, 1948, Lieut. Colonel Broidy was killed while flying an Army plane, in the course of duty. The death was not within the provisions of the Aviation Limitation, and consequently the State Mutual Company refused to pay the $10,000.00 being the coverage recited in the said Certificate.

It is not necessary to recite the testimony given by Mrs. Broidy and Mr. Taylor on the part of the plaintiff, or that of Naumer on the part of the defendant. The former are quite positive in asserting that the latter assured both Colonel Broidy and Mr. Taylor at least twice that the Certificate would constitute a claim under the Policy for the full amount in the event of death while flying and in the line of duty, even under conditions of war.

Naumer's version of the conversation is that he was not entirely sure that Colonel Broidy would be acceptable for inclusion in the Group Insurance as a debtor at all, by reason of his calling, and that the discussion, particularly between him and Colonel Broidy, ended in a statement by the latter to the effect that the application might as well be filed to see what would happen to it. At the trial I gained the impression that Naumer was talking about one thing, namely, eligibility on the part of Colonel Broidy in general for inclusion in this Group Insurance, and that the latter and probably Mr. Taylor were talking about another thing, namely, whether Broidy's life would be covered in the event that he should come to his death while flying, but not as a fare-paying passenger in a licensed passenger aircraft. I was led to this misgiving by observing the demeanor of Naumer as a witness, the fact that he was serving in a temporary capacity to instruct one or more

persons in the employ of Federal in the proper handling of such applications, and finally because he was an authorized agent to solicit ordinary forms of life insurance policies, and was familiar with the Aviation Limitation which is concededly a standard provision in such policies; the waiver of such a limitation on the part of an issuing company may be procured only by the payment of excess premium. Moreover it seemed that Mr. Taylor, the attorney was probably preoccupied with making the computations incidental to closing of the title, and his testimony was that he was interrupted in that process by the discussion between Naumer and Colonel Broidy on the subject of insurance; it seemed that he might not have given his full attention to this particular subject, which would be easy to understand, and therefore that his recollection of the questions that were asked back and forth, and the answers, might have been less than precise, although he clearly believed in the truth of his testimony.

This attempt to reconcile the difference in the two versions has proved to be unsatisfactory on further study of the record and examination of the document, for the reason that eligibility as a debtor within this Group Insurance could scarcely have presented itself as a serious problem in view of the failure of either the Policy, the Certificate, or the application, to contain any reference thereto, apart from the fact that one of two obligors is the wage earner, and that not more than 240 equal monthly installments are contemplated for the liquidation of the indebtedness. Since those were the only essential requirements for acceptance under the Group Insurance Policy, there was no reason for Naumer's having any misgivings on the subject, and consequently the conversation between him and Colonel Broidy and Mr. Taylor must have taken a wider range than he testified to on the witness-stand; the chances are that Naumer was not as familiar as he should have been with the provisions of the Master Policy or the Certificate; that is borne out by his own testimony that he sought to consult the Master Policy there in the files of the Federal, in order to assure himself as to the extent of coverage on the part of Colonel Broidy, but that he failed in his efforts to find the Policy.

I have not overlooked Naumer's testimony that he discussed with Colonel Broidy the wisdom of obtaining an ordinary life Policy and paying an extra premium to avoid the restrictions of the Aviation Limitation, and that Colonel Broidy said that such insurance would be too expensive; that testimony would be consistent with Taylor's statement that in the course of solicitation by Naumer, the latter said: "It doesn't matter how you die, this Policy will cover you." Then Taylor continued: "And we then discussed rates, as I remember it. I don't remember the figures except that I turned to Colonel and Mrs. Broidy and said: 'Do you think you can pay that?', and they said 'Yes, we think we can.' "

The testimony on the whole leaves this situation very much in doubt, but the decision will proceed on the assumption that Naumer indeed said something which apparently led the Broidy's and Taylor to believe that Colonel Broidy would be covered in the event of such a happening as actually took place, although I do not believe or find that he made a deliberate and intentional false representation. At most he was too casual concerning a subject about which he should have been informed if he were to attempt to perform any useful function.

It becomes necessary, therefore, to consider critically Naumer's legal relationship to the State Mutual Company. He was not an agent of the Company; nor was he an employee of Craig & Herren; however, they put him in a position to act for them, and if they possessed the legal capacity to solicit and procure a Certificate of Participation in the Master Policy with the Aviation Limitation omitted, they, and therefore their principal, should be required to provide the contract which was actually negotiated  For present purposes, therefore, the act of Naumer will be deemed that of Craig & Herren. But the scope of their

agency was clearly limited in the Master Policy in respect of the language already quoted: "No agent can * * * alter * * * this contract * * *."

This was binding upon the plaintiff: Boseman v. Connecticut General Life Insurance Co., 301 U.S. 196, at page 203, 57 S.Ct. 686, 81 L.Ed. 1036, 110 A.L.R. 732; King v. Sperry Gyroscope Co., Sup., 57 N.Y.S.2d 684.

The plaintiff's decedent was required to know the limited nature of the authority of Craig & Herren: Curacao Trading Co. v. Federal Insurance Co., 2.Cir., 137 F.2d 911, at page 914 (bottom of 1st column); Marvin v. Universal Life Insurance Co., 85 N. Y. 278, 39 Am.Rep. 657; Drennan v. Sun Indemnity Co., 271 N.Y. 182, 2 N.E.2d 534.

■ These cases teach that even if the decedent relied upon Craig & Herren, through Naumer, to provide a Certificate containing the desired exclusion, reformation as prayed could not be granted unless. in addition, reformation also were to be decreed in respect of the expressed limitation upon the authority of the Company's agents. Not only is none sought, but no evidence has been offered which would enable the Court to enter such a decree.

For a comparison between an adequate showing in the evidential sense between this cause, and those in which relief by way of reformation has been found appropriate, the following cases cited by plaintiff may be examined: Lewitt & Co. v. Jewelers', etc., 249 N.Y. 217, 164 N.E. 29; Barone v. Aetna Life Insurance Co., 260 N.Y. 410, 183 N.E. 900.

The margin by which the proof here falls short of what would be requisite within those decisions, is too apparent to justify discussion or to invite exposition.

■ There is a final consideration which has its place in the circumstances attending the solicitation of the participation Certificate: In view of that discussion, it became important that Broidy upon receipt of his Certificate should have examined it with particular reference to the matters now in controversy. Had he done so, the Aviation Limitation clause could not have escaped his attention, and he would have at once called the attention of the Insurance Company to the failure of the Certificate to state the terms of the agreement having its origin in the interview between Naumer and himself, as he is said to have understood it.

As to the requirement that an insured shall read his Policy (and therefore this Certificate), see: Bollard v. New York Life Insurance Co., 98 Misc. 286, 162 N.Y.S. 706; Satz v. Massachusetts Bonding & Ins. Co., 243 N.Y. 385, 153 N.E. 844, 59 A.L.R. 606; Minsker v. John Hancock Mutual Life Ins Co., 254 N.Y. 333, 173 N.E. 4, 81 A.L.R. 829.

There was an interval, as has been seen, of three months during which Broidy could have taken any steps consistent with the alleged failure of the Company to deliver to him a Certificate in accordance with Naumer's solicitation, and his failure to do that may well point to a realization by him that the Certificate as delivered was indeed in accordance with the representations made on March 15, 1948.

■ The evidence fails to establish, therefore, that there was a contract entered into between Colonel Broidy and the State Mutual Company, other than the one shown in the Certificate of Insurance to which reference has been made, and consequently there is nothing to be reformed. It is unfortunate that the application should have contained no reference to the Aviation Limitation, but there were other provisions of the Policy of importance, such as the grace period, the circumstances under which termination might occur, incontestability, and the like, which also do not appear therein; hence that omission cannot establish a contract between the parties not embodied in the Certificate.

The plaintiff does not even argue that it is entitled to judgment against Federal; it results, therefore, that there must be judgment for the defendants on the merits, but without costs.